# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| RONALD SHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BURLINGTON NORTHERN SANTA FE | ) |
| RAILWAY COMPANY, | ) |
| | ) |
| Defendant. | |

## COMPLAINT

Plaintiff, RONALD SHELL, by and through his attorneys, Nicholas F. Esposito, Bradley K. Staubus, and Brittany N. Bermudez, and for his complaint against Defendant, BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, alleges the following:

### Jurisdiction, Venue, and Parties

1. This action is brought pursuant to the Americans with Disabilities Act (42 U.S.C. § 12101, *et seq.*) and the Illinois Human Rights Act (775 ILCS 5/1–101, *et seq.*) ("IHRA").

2. Jurisdiction exists under 28 U.S.C. § 1331 because this action arises under the laws of the United States, and §1343(4) because this action arises from an Act of Congress for the protection of civil rights. The jurisdiction of this Court is invoked to secure protection of and redress deprivation of rights guaranteed by federal law, which rights provide for damages and other relief for illegal discrimination in employment. The Court also has supplemental jurisdiction under 28 U.S.C. §1367 to adjudicate Plaintiff's state law claims, which arise under the IHRA.

3. Venue in this district is proper under 42 U.S.C. § 2000e-5(f) (3) and 28 U.S.C. § 1391(b) and (c) because the unlawful employment practices occurred in this district, Plaintiff is a citizen of the State of Illinois who currently resides within this judicial district, and the Defendant does business in this judicial district.

**Parties**

4. Plaintiff, Ronald Shell ("Plaintiff"), a sixty-one (61) year-old Caucasian male, is an individual citizen and resident of this district.

5. Defendant, Burlington Northern Santa Fe Railway Company ("Defendant"), is a foreign for-profit corporation registered with the Illinois Secretary of State and doing business throughout the United States, including this district.

**Conditions Precedent**

6. On or around December 20, 2010, Plaintiff timely filed a Charge of Discrimination against Defendant with the Illinois Department of Human Rights. Plaintiff's Charge of Discrimination was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

7. On or around September 17, 2014, the EEOC made a *reasonable cause* determination against Defendant stating that it believed Defendant discriminated against Plaintiff on the basis of a perceived disability when making its decision not to hire him, a violation of the ADA.

8. On or around September 10, 2015, the EEOC issued Plaintiff a notice of a right to sue, and this lawsuit is filed within ninety (90) days of Plaintiff's receipt of such notice on September 10, 2015.

9. Plaintiff has otherwise complied with all federal and state law administrative prerequisites to filing this action.

10. Defendant had been continuously doing business in the State of Illinois and has continuously had at least fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks within the year of or preceding the alleged violation.

11. At all relevant times hereto, Defendant has been an employer under Section 775 ILCS 5/2-101 (B)(1) of the IHRA.

12. At all relevant times hereto, Defendant has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2).

## Facts Common to all Counts

13. On or around March 23, 1977, Santa Fe Railway ("SFR") hired Plaintiff as a driver in its "corwith yard" until in or around 1996 when SFR merged with Defendant. Thereafter, Plaintiff worked for an additional five (5) to six (6) years until Defendant subcontracted the work out to other companies, including Midwest Terminal Service and Rail Terminal Services ("RTS"). Plaintiff's successful career as a driver and/or driver/operator spanned over thirty-four (34) years. His most recent position was driver/operator.

14. Plaintiff's position throughout the years included operating several pieces of heavy machinery including: 1) cranes; 2) sideloaders; 3) forklifts; 3) hostler trucks; and 4) fantuzzy stack reachers.

15. Plaintiff was employed by RTS between 2000 – late December 2010.

16. On information and belief, between 2000 - 2011 Plaintiff had and maintained approximately the same body mass index of or above 40.00.

17. In or around July 2010, Defendant informed all of RTS's employees that it would be taking over all operations in the yard commencing in January 2011. Defendant further informed the employees that they would need to reapply with Defendant in order to retain their jobs.

18. On or around June 23, 2010, Plaintiff notified Defendant that he was interested in continuing his employment with Defendant.

19. On or around June 23, 2010, Defendant informed Plaintiff that he would need to apply for a specific job to be considered an applicant for that job.

20. On or around July 9, 2010, Defendant notified Plaintiff that he was required to undergo a pre-employment aptitude test and drug test, which would be scheduled in mid-July 2010.

21. On or around July 12, 2010, Plaintiff completed an online application for employment with Defendant as an Intermodal Equipment Operator in Chicago, Illinois. On information and belief, the job as Intermodal Equipment Operator was the same job and/or involved the same duties that Plaintiff had been doing for the previous thirty-four (34) years, including operating the following heavy machinery: 1) cranes; 2) sideloaders; 3) forklifts; 3) hostler trucks; and 4) fantuzzy stack reachers.

22. In or around mid- July 2010, Plaintiff took and passed a pre-employment aptitude test and a drug test.

23. In or around late-July/early-August 2010, Plaintiff had a three (3) on one (1) interview with Defendant's personnel. During that interview, it was evident that Plaintiff was qualified for his job, could operate all machinery in the yard efficiently, and even taught other co-workers on how to operate said machinery. The interviewers commented that Plaintiff "could teach them a thing or two about the job".

24. On or around August 2, 2010, Defendant informed Plaintiff that he had "successfully completed the testing and interview process" for the position, Intermodal Equipment Operator. Defendant further informed Plaintiff that it thought he would "make an excellent addition to Defendant's team". On that same day, Defendant offered Plaintiff a conditional offer of employment with an anticipated a start date of January 1, 2011. The offer was conditioned upon successful completion of a physical examination and hair analysis drug screen; background

investigation, proof of employment eligibility, and Defendant's receipt and review of medical history questionnaire.

25. On or around August 2, 2010, Defendant informed Plaintiff that it had notified Comprehensive Health Services, Inc. ("CHS") to initiate his Post Offer of Employment medical examination.

26. On or around August 10, 2010, CHS administered a physical capabilities test to Plaintiff, which included a body mass index test.

27. In or around mid-late August 2010, Plaintiff received the results of his physical capabilities test. The results stated that Plaintiff "[did] not meet minimum physical demands of the essential functions of the Intermodal Equipment Operator." Additionally, according to Defendant, Plaintiff's confirmed height of 6'0 and weight of 332 pounds placed him at a body mass index of 45.1504.

28. In or around September 2010, Plaintiff met with Chris Kowalkowski ("Kowalkowski"), Defendant's Director of Medical Support Services, to review the results of his physical capabilities test. Kowalkowski informed Plaintiff that he was a health risk, that he needed to lose weight, and that his body mass index was not good for his heart. Kowalkowski further informed Plaintiff that because of his body mass index, he probably suffered from sleep apnea and may need to undergo sleep study at Plaintiff's own expense, with no guarantee that he would be offered a job. Plaintiff never suffered from sleep apnea, nor informed Kowalkowski that he suffered from sleep apnea.

29. On or around September 22, 2010, Defendant notified Plaintiff that, while he had completed the necessary steps in the medical evaluation, he had failed the physical capabilities test.

30. On or around October 1, 2010, Plaintiff completed the medical history questionnaire.

31. On or around October 12, 2010, Kowalkowski informed Plaintiff that re-testing for physical capabilities would be available on October 18 and 19, 2010. Kowalkowski further informed Plaintiff that if he "failed the physical capabilities re-test, [Kowalkowski would call him] to discuss a ninety (90) day program and roadmap for re-testing in late December or early January if [Plaintiff wish]ed to do so."

32. On or around October 19, 2010, Plaintiff completed another physical capabilities testing.

33. In or around mid to late-October 2010, Defendant informed Plaintiff that he had passed his physical capabilities test and that he "me[t] minimum physical demands of the essential functions of Intermodal Equipment Operator."

34. In or around mid to late-October 2010, a representative of CHS called Plaintiff to inform him that Defendant was requiring him to undergo test(s) for sleep apnea and that Plaintiff needed to submit his medical records to Defendant for the previous seven (7) years.

35. On or around early-November 2010, Defendant notified Plaintiff he was to attend another exam on November 5, 2010, which he did. Defendant requested copies of notes from Plaintiff's last two (2) visits to his cardiologist and any further testing.

36. On or around November 9, 2010, Defendant rescinded its conditional employment offer to Plaintiff. Defendant informed Plaintiff that he was not qualified for his "safety sensitive" position because of the "significant health and safety risks associated with Class 3 Obesity (Body Mass Index above 40)". According to Defendant, Plaintiff had a body mass index of 44.7424. At that time, Defendant also informed Plaintiff that his case could be reconsidered if he lost at least

6

10% of his body weight (33 pounds) and then maintained that level for at least six (6) months. Defendant further informed Plaintiff that at the end of the six (6) months, depending on his body mass index, Plaintiff may need to provide the following information to document and to permit further evaluation of his health status:

    a.    Sleep study (polysommogram or overnight sleep study);

    b.    Medical report from his physician documenting measured blood pressure, fasting blood sugar level, fasting lipid profile (total,, HDL, LDL cholesterol and triglyceride), documentation of hip and waist measurement: waist (at or below naval) and hip (where buttocks are largest), smoking history and other cardiac risk factors; and

    c.    Clinical exercise tolerance test using a standard protocol that documents his exercise capacity in METS, heart rate recovery and electrocardiographic changes.

Defendant decided not to hire Plaintiff on the basis of his perceived disability, Class 3 Obesity, without showing that the criteria it used to deny him employment was related to the subject position and consistent with job necessity.

    37.    On or around November 11, 2010, Defendant informed Plaintiff that, while he had passed the physical capabilities test, said test was only one medical component of his overall medical review for the position of Intermodal Equipment Operator.

    38.    On or around January 1, 2011, Defendant took over operations from RTS. At that time, Plaintiff was not able to continue his employment with Defendant pursuant to the November 9, 2010 correspondence.

    39.    Defendant's decision to rescind its offer of employment did not take into account Plaintiff's thirty-four (34) year career as a successful driver/operator of the yard.

40. Defendant's decision to rescind its offer of employment did not take into account that Plaintiff's body mass index was approximately the same during the last ten (10) years of his employment as a driver/operator.

41. Plaintiff met other physical qualifications for the position of Intermodal Equipment Operator.

42. Defendant's decision to rescind its offer of employment disqualified Plaintiff from a broad range/class of jobs that Defendant deemed to be "safety sensitive".

### Count I
### VIOLATIONS OF THE AMERICANS WITH DISABLITIES ACT,
### 42 U.S.C. 12101, *et. seq*., AS AMENDED
### (Disability Discrimination)

43. Plaintiff reasserts and incorporates by reference paragraphs one (1) though forty-two (42) as set forth above as if fully restated herein.

44. At all relevant times hereto, Plaintiff was disabled within the meaning of the ADA.

45. Plaintiff was qualified to perform the essential functions of his job, with or without accommodation.

46. Section 42 U.S.C. § 12112(a) of the ADA prohibits an employer from:

> discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

47. Defendant's decision to rescind the Plaintiff's employment offer (failure to hire) based upon his body mass index was in violation of the ADA in that it regarded him as disabled.

48. The effect of this practice deprived Plaintiff of equal employment opportunities and adversely affected his status of an employee vis-à-vis job application procedures and hiring based on his perceived disability.

49. Defendant perceived Plaintiff to be disabled in that his "Level 3 Obesity" placed him as a health risk for "safety sensitive" positions.

50. Defendant believed such condition(s) would substantially limit one or more of Plaintiff's major life activities, including, but not limited to: performing manual tasks and working.

51. As a direct and proximate result of Defendant's discrimination against Plaintiff, he has suffered and will continue to suffer damage including loss of back pay including wages and benefits, liquidated damages, front pay, pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in amounts to be determined at trial.

52. The willful nature of the violations, committed with malice or reckless indifference to the federally protected rights of Plaintiff, warrant statutory punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

53. Plaintiff seeks prejudgment interest, post-judgment interest, and costs including reasonable statutory attorneys' fees and expert witness fees.

WHEREFORE**,** Plaintiff, RONALD SHELL, prays for judgment in his favor and against Defendant, BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and asks that the court award him direct and consequential damages, lost wages and benefits, liquidated damages, front pay, back pay, punitive damages pursuant to 42 U.S.C. § 1981a (b)(1), reasonable statutory attorneys' fees, expert witness fees, and costs, and such other relief as the Court may find appropriate.

### Count II
### VIOLATIONS OF THE AMERICANS WITH DISABLITIES ACT,
### 42 U.S.C. 12101, *et. seq*., AS AMENDED
### (Unlawful Screening)

54. Plaintiff reasserts and incorporates by reference paragraphs one (1) though forty-two (42) as set forth above as if fully restated herein.

55. At all relevant times hereto, Plaintiff was disabled within the meaning of the ADA.

56. Section 42 U.S.C. § 12112(b) provides that:

> the term 'discriminate against a qualified individual on the basis of disability' includes –
>
> (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]

57. Defendant discriminated against Plaintiff on the basis of disability by imposing selection criteria, including medical screening that screens out, tends to screen out, or has a disparate impact on individuals who disclose disabilities that are not shown to be job-related for the position in question and are not consistent with business necessity.

58. As a direct and proximate result of Defendant's discrimination against Plaintiff, he has suffered and will continue to suffer damage including loss of back pay including wages and benefits, liquidated damages, front pay, pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in amounts to be determined at trial.

59. The willful nature of the violations, committed with malice or reckless indifference to the federally protected rights of Plaintiff, warrant statutory punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

60. Plaintiff seeks prejudgment interest, post-judgment interest, and costs including reasonable statutory attorneys' fees and expert witness fees.

WHEREFORE**,** Plaintiff, RONALD SHELL, prays for judgment in his favor and against Defendant, BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and asks that the court award him direct and consequential damages, lost wages and benefits, liquidated damages, front pay, back pay, punitive damages pursuant to 42 U.S.C. § 1981a (b)(1), reasonable statutory attorneys' fees, expert witness fees, and costs, and such other relief as the Court may find appropriate.

### Count III
### VIOLATION OF THE AMERICANS WITH DISABLITIES ACT, 42 U.S.C. 12101, *et. seq.,* AS AMENDED
### (Impermissible Medical Examination)

61. Plaintiff reasserts and incorporates by reference paragraphs one (1) though forty-two (42) as set forth above as if fully restated herein.

62. At all relevant times hereto, Plaintiff was disabled within the meaning of the ADA.

63. Section 42 U.S.C. § 12112(d)(4) provides that:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

64. Though it was neither job-related nor consistent with business necessity, Defendant required an initial medical examination, a subsequent medical examination, and inquired as to whether Plaintiff is an individual with a disability and as to the nature and severity of the disability.

65. As a direct and proximate result of Defendant's discrimination against Plaintiff, he has suffered and will continue to suffer damage including loss of back pay including wages and benefits, liquidated damages, front pay, pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in amounts to be determined at trial.

66. The willful nature of the violations, committed with malice or reckless indifference to the federally protected rights of Plaintiff, warrant statutory punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

67. Plaintiff seeks prejudgment interest, post-judgment interest, and costs including reasonable statutory attorneys' fees and expert witness fees.

WHEREFORE**,** Plaintiff, RONALD SHELL, prays for judgment in his favor and against Defendant, BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and asks that the court award him direct and consequential damages, lost wages and benefits, liquidated damages, front pay, back pay, punitive damages pursuant to 42 U.S.C. § 1981a (b)(1), reasonable statutory attorneys' fees, expert witness fees, and costs, and such other relief as the Court may find appropriate.

## Count IV
## VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT, 775 ILCS 5/1-101
### (Disability Discrimination)

68. Plaintiff reasserts and incorporates by reference paragraphs one (1) though forty-two (42) as set forth above as if fully restated herein.

69. At all relevant times hereto, Plaintiff was disabled within the meaning of the IHRA.775 ILCS 5/1-103 (I).

70. Plaintiff was qualified to perform the essential functions of his job, with or without accommodation.

71. Section 775 ILCS 5/2-102 (A) provides that it is a civil rights violation for an employer to:

> to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or

conditions of employment on the basis of unlawful discrimination….

72. Defendant's decision to rescind the Plaintiff's employment offer (failure to hire) based upon his body mass index was in violation of the IHRA in that it regarded him as disabled.

73. The effect of this practice deprived Plaintiff of equal employment opportunities and adversely affected his status of an employee vis-à-vis job application procedures and hiring based on his perceived disability.

74. Defendant perceived Plaintiff to be disabled in that his "Level 3 Obesity" placed him as a health risk for "safety sensitive" positions.

75. Defendant believed such condition(s) would substantially limit one or more of Plaintiff's major life activities, including, but not limited to: performing manual tasks and working.

76. As a direct and proximate result of Defendant's discrimination against Plaintiff, he has suffered and will continue to suffer damage including loss of back pay including wages and benefits, liquidated damages, front pay, pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff is thereby entitled to general and compensatory damages in amounts to be determined at trial.

77. The willful nature of the violations, committed with malice or reckless indifference to the federally protected rights of Plaintiff, warrant statutory punitive damages pursuant to 42 U.S.C. § 1981a(b)(1).

78. Plaintiff seeks prejudgment interest, post-judgment interest, and costs including reasonable statutory attorneys' fees and expert witness fees.

WHEREFORE, Plaintiff, RONALD SHELL, prays for judgment in his favor and against Defendant, BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, and asks that the court award him direct and consequential damages, lost wages and benefits, liquidated damages,

front pay, back pay, punitive damages pursuant to 42 U.S.C. § 1981a (b)(1), reasonable statutory attorneys' fees, expert witness fees, and costs, and such other relief as the Court may find appropriate.

**JURY TRIAL DEMANDED FOR ALL COUNTS**

                                                 Respectfully submitted,
                                                 **RONALD SHELL**,
                                                 Plaintiff,
                                                 By: /s/ Brittany N. Bermudez
                                                 One of Plaintiff's Attorneys

Nicholas F. Esposito, Atty. # 0755176
Bradley K. Staubus, Atty. # 6230326
Brittany N. Bermudez, Atty. # 6317591
ESPOSITO & STAUBUS LLP
7055 Veterans Blvd., Unit B
Burr Ridge, IL 60527
(312) 346-2766