# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RONALD SHELL, | ) |
| | ) |
| Plaintiff, | ) Case No. 15-cv-11040 |
| | ) |
| v. | ) Judge Sharon Johnson Coleman |
| | ) |
| BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Ronald Shell, brings this action against the Burlington Northern Santa Fe Railway Company ("BNSF"), alleging that BNSF violated the Americans with Disabilities Act (ADA) by discriminating against him based on a disability. BNSF now moves for summary judgment on Shell's remaining claims. For the reasons set forth herein, that motion [79] is denied.

**Initial Matters**

As an initial matter, the Court turns to the sufficiency of the parties' Rule 56.1 statements. Many of Shell's Local Rule 56.1(b)(3)(B) responses do not expressly admit or deny, with supporting evidence, BNSF's statements of fact. A response to a statement of facts may not assert facts beyond what is fairly responsive to the movant's factual assertion. *Schwab v. Northwestern Illinois Medical Center*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014). It is also inappropriate to admit a fact and then proceed to provide further information in the response. *Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *5 (N.D. Ill. Aug. 4, 2003) (St. Eve, J.). Accordingly, the Court will disregard the facts in Shell's Local Rule 56.1(b)(3)(B) responses that go beyond what is responsive to the corresponding paragraphs of BNSF's Local Rule 56.1(a)(3) statement.

Shell also asserts that he "lacks information and belief" as to a number of BNSF's Rule 56.1(a)(3) statements of fact. Because Shell does not deny these statements with specific reference

1

to the parts of the record supporting that denial, ¶¶ 9, 10, 11, 12, 13, 20, 21, 22, 24, 25, and 26 of BNSF's Rule 56.1(a)(3) statements are deemed to be admitted. *See Id.* at \*6 (recognizing that denying a statement of fact by claiming insufficient information is improper and results in the admission of the statement). Shell also repeatedly "disagrees" with BNSF's Rule 56.1(a)(3) statements without referencing any record evidence relevant to the subject matter in question, in clear contravention of Local Rule 56.1(b)(3)(b). Accordingly, ¶¶ 14, 15, 16, 17, and 31 of BNSF's Rule 56.1(a)(3) statements are also deemed to be admitted. *Id.* at \*4.

**Background**

The following facts are undisputed unless otherwise noted. Shell was employed by Rail Terminal Services (RTS), which was responsible for intermodal operations at BNSF's Corwith railyard. In July 2010, BNSF announced that it would be taking over the operations of the Corwith yard from RTS and invited RTS' employees to apply to work for BNSF. Shell applied to BNSF for the position of Intermodal Equipment Operator (IEO). BNSF requires that Intermodal Equipment Operators be able to act as a groundsmen, hostlers, and crane operators. Generally, groundsmen are responsible for climbing on railcars to insert and remove container interlocker devices; hostlers are responsible for operating trucks to move trailers within the yard; and crane operators are responsible for operating the overhead cranes that load and unload intermodal containers from trains and truck chassis. BNSF defined the IEO position as a safety-sensitive position because it involves working around and operating heavy equipment. Although Shell had previously worked for RTS, his prior position did not require that he be able to fulfill all three functions comprising the IEO position. Nevertheless, Shell had many years of experience working in a similar capacity and was experienced in operating a broad array of relevant equipment.

Following an interview process, BNSF made Shell a conditional offer of employment as an IEO with a scheduled start date of January 1, 2011. The offer was conditioned on Shell's successful

completion of a background check, drug test, physical examination, and medical evaluation. BNSF contracts with Comprehensive Health Services ("CHS") to coordinate BNSF's post-offer, pre-employment medical-evaluation process. As part of the evaluation process, applicants are asked to complete a BNSF Medical Questionnaire. CHS then talks with the candidate if needed, arranges for any additional assessments that may be necessary, and transmits the information gathered to BNSF's Medical and Environmental Health Department ("MEH"), which is responsible for determining the medical qualification of post-offer candidates.

As part of its medical-evaluation process, BNSF considers the Body Mass Index ("BMI") of applicants for safety-sensitive positions such as IEO. BNSF believes that there are significant risks associated with having individuals with a BMI of 40 or greater (commonly labelled as Class III obesity) working in safety-sensitive roles. In particular, individuals with Class III obesity are at a substantially higher risk of developing a number of medical conditions including sleep apnea, diabetes, and heart disease, all of which can manifest as a sudden incapacitation or a serious impairment of alertness or cognitive ability. BNSF believes that the safety risks are especially problematic because the first presentation of these conditions in an individual with Class III obesity is unpredictable and might well be at the time of a debilitating incident. Accordingly, BNSF does not hire applicants for safety-sensitive positions if their BMI is over 40.

After receiving his conditional offer of employment, Shell completed the medical history questionnaire. On the questionnaire, Shell did not disclose any medical conditions (including those associated with Class III obesity), described his overall health as "very good," and reported no problems with work or other daily activities as a result of his physical health. CHS also coordinated a physical examination of Shell, which established that Shell was 5' 10" tall and weighed 331 pounds, meaning that his BMI was 47.5. CHS forwarded these results to Dr. Michael Jarrad, BNSF's chief medical officer. Dr. Jarrad reviewed the information submitted and determined that Shell was not

3

medically qualified for a safety-sensitive position due to the health and safety risks associated with his BMI.  CHS communicated Dr. Jarrad's decision to Shell, who understood that BNSF was withdrawing its offer of employment.  Shell was also informed that his case might be eligible for reconsideration if he lost ten percent of his weight, maintained that weight loss for six months, and provided any additional test results that were requested.  If Shell had complied with this procedure, his application would have been considered even if, despite losing ten percent of his weight, he still had a BMI that fell within the range of Class III obesity.

Dr. Jarrad's decision was based solely on Shell's BMI, and not on any existing physiological disorder or functional limitation.  Dr. Jarrad did not request any further examination to determine if Shell did in fact suffer from sleep apnea, diabetes, or heart disease.  There is no evidence to suggest that Shell does suffer from these conditions.  There is also no evidence to suggest that Shell's weight results from an underlying medical condition.

**Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In determining whether a genuine issue of material fact exists, this Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  However, "[m]erely alleging a factual dispute cannot defeat the summary judgment motion."  *Samuels v. Wilder*, 871 F.2d 1346, 1349 (7th Cir. 1989).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.

**Discussion**

Shell contends that BNSF violated the ADA by taking an adverse employment action against him because it regarded him as being disabled. The ADA generally provides that no "covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). In order to prevail on an ADA discrimination claim, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of the job, and (3) the employer took an adverse action against him on the basis of his disability. *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 631 (7th Cir. 2003). One of the acts which may constitute "discriminating against a qualified individual on the basis of a disability" is the use of "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(6). The use of such a qualification standard, test, or other criteria is only permissible if it is "shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).[1]

The ADA defines a disability as a physical or mental impairment that substantially limits one or more major life activities; a record of such an impairment; or being regarded as having such an impairment. 42 U.S.C. § 12102(1). An individual is regarded as having an impairment if the individual establishes that "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3).

The EEOC further defines "physical or mental impairment" as including "[a]ny physiological disorder or condition . . . affecting one or more body systems . . . ." The EEOC, in interpretive guidance, further explains that:

---

[1] Shell's complaint alleges separate violations of 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6) as individual counts. Section 12112(b)(6), however, is guidance to be used in interpreting section 42 U.S.C. § 12112(a), and this Court accordingly views the pleading of these sections as separate counts to be duplicative.

5

> It is important to distinguish between conditions that are impairments and physical, psychological, environmental, cultural, and economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, left-handedness, or height, weight, or muscle tone that are within "normal" range and are not the result of a physiological disorder. The definition, likewise does not include characteristic predisposition to illness or disease.

29 C.F.R. § 1630 App. § 1630.2(h).

Shell primarily contends that BNSF regarded him as disabled based on his obesity. BNSF, in response, asserts that obesity is only an ADA-defined impairment when it results from an underlying physiological cause. Although district courts are currently split on the question of whether a plaintiff alleging disability discrimination based on obesity must demonstrate that his obesity results from an underlying physiological disorder, judges in this district have recognized that severe obesity is not a disability under the ADA unless it results from an underlying physiological condition. *Richardson v. Chicago Transit Authority*, --- F.3d ---, 2017 WL 5295701, at *6 (N.D. Ill. Nov. 13, 2017) (Blakey, J.). Every circuit court to consider this question, moreover, has agreed that obesity is only an impairment under the ADA when it results from an underlying physiological disorder. *See, e.g., Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1109 (8th Cir. 2016) ("Taken as a whole, the relevant statutory and regulatory language makes it clear that for obesity to qualify as a physical impairment—and thus a disability—under the ADA, it must result from an underlying physiological disorder or condition"); *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442–43 (6th Cir. 2006); *Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997). These decisions are consistent with the EEOC's regulatory guidance distinguishing between actionable impairments and physical characteristics, such as height and weight, that fall within the "normal" range and do not result from physiological disorder. 29 C.F.R. § 1360 App. §1630.2(h). Although Shell rejects these decisions, he offers no compelling argument for why their interpretation of the relevant statutes and regulations is incorrect or why this Court should deviate from them. Accordingly, this Court adopts the majority

6

view that obesity constitutes an ADA impairment only when it results from an underlying physiological condition or disorder.

Here, it is undisputed that BNSF did not believe Shell's obesity to be the result of a physiological disorder, and accordingly BNSF was incapable of perceiving Shell's obesity as a physical impairment within the meaning of the ADA.[2] Shell has also failed to establish that BNSF perceived his obesity as a disability. It is undisputed that BNSF did not believe that Shell was unable to perform his physical job functions as a result of limitations posed by his weight, in sharp contrast to the cases which Shell relies on that have treated obesity as a perceived disability. *See, e.g.,* E.E.O.C. v. Texas Bus Lines, 923 F. Supp. 965, 979 (S.D. Tex. 1996) (treating obesity as a perceived disability where a bus driver applicant was denied a position based on the belief that she could not move around swiftly in case of an accident). Instead, BNSF admits that it acted based on the correlation between Class III obesity and other conditions, such as sleep apnea, diabetes, and heart disease that can lead to a high risk of sudden incapacitation. Thus, although BNSF acted based on Shell's obesity, it did so solely because Class III obesity signaled the potential presence of the conditions that actually concerned BNSF, and not because it believed that Shell's weight impacted his ability to perform major life functions.

Shell alternatively contends that, if BNSF did not regard him as disabled because of his obesity, it regarded him as disabled in light of his risk of developing sleep apnea, heart disease, or diabetes.[3] BNSF does not dispute that these conditions are capable of constituting impairments under the ADA. *See generally Tate v. Ancell*, 551 F. App'x 877, 884 (7th Cir. 2014) (implicitly agreeing that sleep apnea constitutes a physical impairment); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923

---

[2] Shell does not appear to contend that a condition may be "perceived" to be an impairment under the ADA when it would be impossible for that condition to actually constitute an impairment under the statute.
[3] Although Shell only advances this argument through reference to cases concerning sleep apnea, his argument clearly encompasses heart disease and diabetes, and the inclusion of these conditions does not impact the substance of his claims.

7

(7th Cir. 2001) (recognizing that insulin-dependent diabetes can constitute a physical impairment); *O'Keefe v. Varian Assocs., Inc.*, No. 95 C 4281, 1998 WL 417498, at *15 (N.D. Ill. 1998) (Gottschall, J.) (collecting cases holding that heart disease is an impairment, but observing disputes about the extent to which it substantially affects major life activities).

In *EEOC v. Amsted Rail Co., Inc.*, --- F.3d ---, 2017 WL 5499384 (S.D. Ill. Nov. 16, 2017), Judge Gilbert of the Southern District of Illinois was faced with a situation substantially similar to this case. Ingram, one of the plaintiffs, had previously suffered from carpal tunnel syndrome, but had received corrective surgery and was therefore no longer impaired. Amsted nevertheless refused to hire Ingram based on its admitted fear that he might again develop carpal tunnel syndrome in the future and therefore become unable to perform his duties. Judge Gilbert, channeling a previous dissent by Judge Wood, observed that this conduct "smacks of exactly the kind of speculation and stereotyping that the [ADA] was designed to combat." *Id.* at *6 (quoting *EEOC v. Rockwell Int'l Corp.*, 243 F.3d 1012, 1019 (7th Cir. 2001) (Wood, J., dissenting)). In light of Amsted's concession that it refused to hire Ingram because it feared that he would develop carpal tunnel syndrome in the future, the court found that "no reasonable jury could fail to find [that Amsted] regarded him as disabled." *Id.* at *7.

Here, BNSF has readily admitted that it refused to hire Shell based on its fear that he would develop sleep apnea, diabetes, or heart disease, and that as a result he might become suddenly and unexpectedly incapacitated while performing his duties. Shell does not suffer from any of these conditions at present, and therefore cannot prevail on a claim of disability discrimination under section 12012(2)(A) of the Act. But there can be no doubt that, at a minimum, there exists a dispute of material fact as to whether BNSF is treating Shell as if he does suffer from those conditions. Shell, to BNSF's apparent view, is a ticking time bomb who at any time may be suddenly and unexpectedly incapacitated by one or more of the potential medical conditions that he might

8

develop. BNSF's refusal to consider hiring Shell and monitoring him for the conditions that it fears suggests that BNSF believes that Shell suffers from the conditions—or perhaps more accurately the potential effects of the conditions—at the present time. It is on that basis that BNSF contends Shell's employment would pose an unacceptable safety risk.

Of course, if Shell actually suffered from any one of the impairments at issue, he would fall within the scope of section 12012(2)(A) and be able to establish a prima facie case of disability discrimination based on BNSF's refusal to hire him. This Court can see no reason why BNSF should be held to a lesser standard merely because it is engaging in adverse employment actions before an impairment arises, when there can be no doubt that BNSF is acting based on its belief that Shell poses a present safety risk as a result of potential disabilities.[4] BNSF is acting based upon an anticipated worst case scenario derived from precisely the sort of myth, fear, or stereotype which the ADA is meant to guard against. *See generally Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 954 (7th Cir. 2000); *Wright v. Illinois Dept. of Corrections,* 204 F.3d 727, 731 (7th Cir. 2000).

BNSF's reliance on the Eight Circuit's decision in *Morriss* is misplaced. In *Morriss*, the plaintiff claimed that BNSF had regarded him as having a physical impairment based on his disability. The circuit court, however, only considered whether Morriss' obesity constituted impairment under the ADA, not whether the underlying conditions motivating BNSF's conduct constituted disabilities. BNSF's reliance on the EEOC's interpretive guidance is similarly misplaced. The EEOC's guidance provides that the definition of "impairment" does not include "characteristic predisposition to illness or disease." The Court, however, perceives a clear distinction between being predisposed to illness generally and, as is the case here, being predisposed to developing a disability subject to the ADA. BNSF has provided this Court with no authority suggesting that the

---

[4] BNSF essentially argues that, although it is prohibited by law from discriminating against individuals who actually have disabilities, it should be free to discriminate against those who are likely to have disabilities but have not yet developed them. This argument is facially illogical and is antithetical to the protections afforded by the Americans with Disabilities Act and other anti-discrimination statutes.

9

EEOC's guidance was intended to, or has been interpreted to, extend to the situation presented here. To the contrary, the EEOC expressly recognized that although "other conditions" that are not the result of a physiological disorder, such as pregnancy, are not impairments, "a pregnancy-related impairment that substantially limits a major life activity is a disability under the first prong of the definition . . . or may be covered under the "regarded as" prong if it is the basis for a prohibited employment action and is not "transitory or minor." 29 C.F.R. § 1360 App. §1630.2(h). The EEOC thus recognized that impairments caused by "other conditions" such as obesity can independently give rise to a "regarded as" disability discrimination claim. BNSF has accordingly failed to establish that this case should be distinguished from *Amsted* or that *Amsted* was wrongly decided.

BNSF further contends that even if Shell can make out a prima facie case, its actions are protected under the business-necessity defense. The ADA provides, in pertinent part, that:

> It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a). The employer's burden to show that a qualification standard satisfies the business necessity defense is "quite high," and is not to be confused with "mere expediency." *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1057 (9th Cir. 2009). In the event that the employer is able to satisfy its burden of establishing that the qualification standard at issue is job-related and consistent with business necessity, the burden shifts to the plaintiff to offer a reasonable accommodation that would allow him to satisfy that standard. *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 (11th Cir. 2009).

Here, the undisputed evidence establishes that individuals with Class III obesity are at a "substantially higher" risk of developing a number of medical conditions, including heart disease,

10

diabetes, and sleep apnea, and that those conditions "frequently manifest" as sudden incapacitation or serious impairment of alertness or cognitive function. "Substantially higher" and "frequently," however, are indefinite terms that are incapable of conveying the actual risk that Shell would develop one of these conditions or become unexpectedly impaired. After reviewing the record, the Court can find no specific information about the risks that have motivated BNSF's conduct here. Thus, it is impossible to determine whether Shell's health posed so great a safety risk that his exclusion from safety-sensitive positions constituted a business necessity.[5] This is especially the case because, here, BNSF offered to consider Shell for employment if he lost 10% of his weight, even if he remained at a class III obesity level. BNSF concedes that the risks inherent in Class III obesity would remain in such a situation, although BNSF would require additional testing. BNSF's willingness to employee individuals with Class III obesity upon marginal weight loss undermines its claim that individuals with Class III obesity are inherently too dangerous to employee in safety-sensitive positions. Accordingly, a dispute of material fact remains as to whether it was truly necessary to exclude Shell and other individuals with Class III obesity from safety-sensitive positions. BNSF has accordingly failed to establish that it is entitled to summary judgment on its business necessity defense.

**Conclusion**

For the foregoing reasons, BNSF's motion for summary judgment [79] is denied.

IT IS SO ORDERED.

Date: 3/5/2018

Entered: _____
SHARON JOHNSON COLEMAN
United States District Court Judge

---

[5] BNSF correctly notes that Shell has offered no testimony from a medical expert to controvert its assessment of the risks of Shell's obesity. BNSF's own evidence, however, is insufficient to warrant such a rebuttal, having been based solely on indefinite and vague comparative statements of risk.